UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANET BEER
        Plaintiff,                        CIVIL ACTION NO. 09-13954

    v.                               DISTRICT JUDGE JULIAN ABELE COOK

COMMISSIONER OF              MAGISTRATE JUDGE VIRGINIA MORGAN
SOCIAL SECURITY,

        Defendant.
_____/

## REPORT AND RECOMMENDATION

In her senior year of college at University of Michigan Dearborn with a major in teaching and working as a waitress, plaintiff, then age 24, was awarded social security benefits beginning January 5, 2007 due to her seizure disorder. Plaintiff now seeks judicial review of the defendant's decision denying plaintiff's application for Title II social security disability benefits from her alleged onset date of May 6, 2006 through January 5, 2007. It is recommended that the decision denying benefits be affirmed.

Plaintiff filed this action *pro se* and was granted *in forma pauperis* status. After review of the medical records and the record as a whole, the court concludes that substantial evidence supports the ALJ's denial of benefits.[1] Plaintiff alleged disability based on ovarian cysts and

---

[1] Not before the court is whether plaintiff was entitled to benefits as of January 5, 2007. It appears that there is little medical or other independent evidence to support such a determination and whether the seizure disorder is controlled by medication. It also appears that plaintiff may have filed for disability in June, 2006 and was denied. (Tr. 120, 137).

- 1 -

seizures. As part of a proto-type, plaintiff's case did not go through a re-examination and she attended a video conferenced hearing with ALJ James Mitchell in California at which she, her aunt, and a vocational expert testified. Plaintiff represented herself at the hearing. The ALJ found at step two that plaintiff had the severe impairment of seizure disorder, and he found her disabled as of January 5, 2007. He determined that before that date, plaintiff had the residual functional capacity to perform light to medium work as defined in 20 CFR 404.1567(c) and 416.967(c) with seizure precautions. Plaintiff now appeals, alleging that she has been disabled since May 6, 2006. Plaintiff did not file a brief but instead wrote a letter and basically contends that the finding is not supported by substantial evidence. Defendant contends otherwise. For the reasons discussed in this report, it is recommended that the defendant's motion for summary judgment be granted, that of the plaintiff denied, and the decision denying benefits be affirmed.

At the time of the ALJ's decision, plaintiff was 24 years old. She was born November 2, 1982. She anticipated graduating from the University of Michigan Dearborn and receiving a degree in teaching; she was a senior at the time of the hearing. She was student teaching at a local elementary school and claimed that she quit her last job as a waitress due to having seizures. Plaintiff stated that she lived at the home of her boyfriend's parents.

**Standard of Review**

The Commissioner's final decision is subject to judicial review under 42 U.S.C. § 405(g), which provides, *inter alia:* "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)). A court " 'must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.' " *Colvin v. Barnhart,* 475 F.3d 727, 729-30 (6th Cir.2007) (quoting *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997)). If the Commissioner's decision is supported by substantial evidence, the court must defer to that decision "'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir.2004) (quoting *Wright v. Massanari,* 321 F.3d 611, 614 (6th Cir.2003)).

Disability is the inability "[t]o engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Id.* § 1382c(a)(3)(A). An individual will only be determined to b under a disability if his impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Id.* § 1382c(a)(3)(B).

The ALJ, in determining whether a claimant is disabled, conducts a five-step analysis:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Commissioner*, 127 F.3d 525, 529 (citing 20 C.F.R. § 404.1520).

Under the five-step inquiry, the claimant bears the burden of proof through the first four steps, and the Commissioner bears the burden of proof at the final step. *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 474 (6th Cir.2003). To prevail at step five, the Commissioner must "identify a significant number of jobs in the economy that accommodate the claimant's residual functioning capacity," *id.,* taking into account factors such as age, education, and skills. *Walters,* 127 F.3d at 529.

The issue before the court is whether to affirm the Commissioner's determination. In *Brainard v. Secretary of HHS*, 889 F.2d 679, 681 (6th Cir. 1989), the court held that:

> Judicial review of the Secretary's decision is limited to determining whether the Secretary's findings are supported by substantial evidence and whether the Secretary employed the proper legal standards in reaching her conclusion. 42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L. Ed. 2d 842 (1971).

> Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L. Ed. 2d 126 (1938). The scope of our review is limited to an examination of the record only. We do not review the evidence *de novo*, make credibility determinations nor weigh the evidence. Reynolds v. Secretary of Health and Human Services, 707 F.2d 927 (5th Cir. 1983).

*Brainard,* 889 F.2d at 681.

**Background**

In her teleclaim interview on 6/22/07, plaintiff stated that she became disabled as of May 6, 2006. She stopped working that day because she "was having seizures." (Tr. 112) She worked as a waitress at unidentified restaurants: from age 14 or 15 to age 18 (1997 to 2000) and from years 2003 through May 6, 2006. She does not report any work from 2000 through 2003. (Tr. 113) Yet, her social security earnings record show earnings as follows:

- 2000:   $ 4987.37
- 2001:   $ 9246.48
- 2002:  $10,675.61
- 2003:   $ 3667.98
- 2004:  $13,109.25

No explanation is provided for the additional $20,000+ of income.[2]

Plaintiff stated to the interviewer that she "was very forgetful–she didn't understand the process of filing for disability and she had difficulty remembering different events–she says she

---

[2]The issue was not addressed by the ALJ.

has to right (sic) everything down since her memory is afftected (sic) by the seizures or her medication." No medical evidence was brought to the interview. (Tr. 121)

**The Medical Evidence**

Plaintiff identifies Dr. Jose DeSousa (2003), Dr. Bassam Maaz (2003-2007), and Dr. Donald Shin (1997 to 2002) as her treaters.(Tr. 115)  Plaintiff reports taking Lanictal prescribed by Dr. Maaz for her seizures.  She stated that she has no side effects from the treatment. (Tr. 116)

Plaintiff completed a "Function Report-Adult" on June 29, 2007.  (Tr. 123-137) She states that her symptoms are tiredness, drooling, headache and confusion. She lives with her grandparents but they are away for most of the year. (Tr. 123) She states that her condition affects her ability in all areas: to lift, carry, stand, walk, climb, bend, kneel, reach, use hands, see, hear, and talk. She can't do anything when she is having a seizure and when she comes out of a seizure, the abilities return very slowly. (Tr. 124)   She can walk 8 hours, stand 8 hours, sit 8 hours, bend frequently, carry 20 pounds frequently, 30 pounds occasionally, and reach frequently. (Tr. 125) Any time she has a seizure, she loses the ability to pay attention, read, follow instructions, handle stress, but it does not affect her ability to handle change in routine. (Tr. 126) She takes her medication and uses her cell phone alarm to remind her. Id.   Her treatment does not affect her ability to do things. (Tr. 127)   Her seizures affect her personal care activities and she does not bathe alone. She does not need reminders.  Sometimes she has seizures while she is sleeping and it causes her to wake up and she has a mess of drool that she has to clean up. (Tr. 128) She states that she can't drive and she can't be alone. (Tr. 129) She is always with someone like family, friends, or classmates who know about her seizures. (Tr. 129)   She can't use the stove when she

is alone because she might fall into the fire. (Tr. 131)  She normally orders take out meals, and eats a lot of TV dinner meals and cereal when she is home alone. (Tr. 131)   She can't do much of anything when she is home alone.  She can't do chores when she is home alone; she has to wait until someone is with her.³  She rarely goes grocery shopping, orders clothes and other items online. (Tr. 133) She goes to movies, the park, and talks on the phone with friends.  When she is home alone, she watches TV sitting on the couch. (Tr. 134)

She states that she had seizures at two different jobs and the staff was treating her so bad she had to quit. (Tr. 135) She reads, watches TV and will sew when company is present. Id.  She can't do a lot of things by herself except for reading, TV, and computer. (Tr. 136)   She writes that her doctor is terrible and it's hard to see someone else without insurance.  She can't get a full time job because of her full time enrollment at the University, so she really needs benefits. (Tr. 137)

What appears to be a medical note dated August 2005 following the function sheets indicates that plaintiff reported having her first seizure in 2000 and was taken to the hospital. She was sent home the next day with no meds. Since that time, she reportedly had ten more spells. One had occurred two days earlier at work, she was taken to the ER but refused to stay.  She had a black eye from a fall that she sustained at the time of the seizures.  The diagnosis was generalized tonic-clonic seizure, etiology unknown.  She was prescribed Lanictal, 25 mg.  In

---

³No explanation is given by her or the ALJ for the apparent inconsistency between never being alone (Tr. 129) and situations when she is alone. (Tr. 131-2)

December, 2005, an EEG showed irritative features from left temporal region. When seen in March, 2006, she was not on any medication. (Tr. 138)

**The Administrative Hearing**

At the hearing in 2008, plaintiff testified she was in her fourth year at the University. (Tr. 7-8) She prepared simple meals and sandwiches, loaded the dishwasher, did laundry, made her bed, attended church twice a month, and was on the computer 20 hours a week for school. (Tr 18-22) She eats a lot of fast food, hardly ever cleans the house, and would only change the sheets once a month. (Tr. 20) She visited with people and was student teaching from 7 am to 4 pm during the work week at Lafayette Elementary School in Lincoln Park. (Tr. 9) Plaintiff smoked two packs of cigarettes a day, she did not drive due to seizures. She has worked as a waitress since high school. (Tr. 9) She last filed taxes in 2006. (Tr. 10) Plaintiff stated that she has seizures up to 7 times a month; she takes medication three times a day. Her memory gives her problems. (Tr. 14-16) Plaintiff stated that she has been supporting herself on student loans.[4]

The ALJ asked her how she selected May 6, 2006 as her onset date. She answered that she had her first seizure on May 6, 2006. This is inconsistent with the medical records and other notes, however.[5] Except for student teaching when she gets up earlier, she usually gets up at 9, takes her medication, and goes to bed about 11 or 12 at night. (Tr. 17)

---

[4]In her letter response she states that she owes $35,830 dollars and it is in deferment but accruing interest at 4.9%. After she was awarded benefits, she receives $786.00 a month and $16.00 in food stamps. She needs more help. (Letter brief #16)

[5]In her letter brief, she said that the first seizure should have been May, 2000 but this does not make sense given the fact that the ALJ asked about why she selected May 6, 2006 as her onset date and she answered that was the date of the first seizure. (See, D/E#16#1; Tr. 16)

- 8 -

Plaintiff stated that she just moved to Wyandotte and lives with her boyfriend's parents. She does not pay rent; someone drives her to student teaching every day which is only about three miles away. Her previous address was on James in Garden City, Michigan. (Tr. 18) She reads for school and does the cross word puzzle in the newspaper. (Tr. 21) In addition to student teaching from 7 to 4, she takes a seminar once a week in the evening for three hours on Wednesday. (Tr. 22) She testified that she does not babysit or care for relatives; she does not drink. (Tr. 24) Her treating physician is Dr. Glynn and Dr. DeSousa. At the time of the hearing she had only seen Dr. Glynn for one week. (Tr. 25) She does not treat with a psychiatrist; she has been hospitalized only once and it may have been two years prior–she was not sure. (Tr. 26) She has one DUIL but does not drink and does not drive. (Tr. 28-29)

She has no physical problems, no hearing problems, no sensory deficits. (Tr. 31) She has pain sometimes resulting from seizures; these are migraine headaches. (Tr. 32) She has been diagnosed with seizures but no paralysis. She likes to bowl, go out with her boyfriend, do craft projects, and sew. (Tr. 34) She testified that her "brain is just a big jumble now" (Tr. 34). Her boyfriend does a lot for her. (Tr. 35)

Janetta Cagle testified at the hearing. She is plaintiff's aunt. Ms. Cagle testified that when plaintiff has a seizure, she just stares off into space. She clenches her fist, drools, and is incoherent of anything around her. She can fall also. (Tr. 36) In the last twelve months, Ms. Cagle said that she had seen four seizures. They have all occurred at Ms. Cagle's house. Each lasts five to ten minutes. They have never occurred in public. (Tr. 37) Plaintiff does not froth at the mouth; she drools. Id. She staggers if the seizure comes on while she is walking. If she is in a

chair she does not fall. Recovery can be pretty quick but sometimes it is the whole day. (Tr. 38-39) One time she fell outside and cut her chin on the gas grill; but she did not go to the hospital because she had no insurance. (Tr. 40)

David Dettmer testified as a vocational expert. Plaintiff's past work was primarily as a waitress. (Tr. 45) The VE opined that if plaintiff were able to do medium work with restrictions of lifting and pulling 25 pounds frequently, 50 pounds occasionally, walk, stand, stoop frequently and sit occasionally, then she could her past work. If she were limited in concentration, and on seizure precautions, limited to public contact three hours or less, she could do light general jobs. The frequency and recovery time with respect to the seizures is the determining factor in employability. (Tr. 48) There was some additional discussion with the claimant and they went off the record. (Tr. 52-53)

**The ALJ's Opinion**

In this case, the ALJ determined that plaintiff's symptoms were not sufficient to establish onset prior to January 5, 2007. He found that plaintiff was on no medication prior to that date. Seizure precautions were established by Dr. Bassam Maaz, MD, according to the ALJ, on January 5, 2007 (Tr. 161) The ALJ considered SSR 96-6p and the opinions of the State Agency medical consultants and concluded that the opinions were generally consistent with the evidence of record. (Tr. 63) The ALJ found that after the onset date of January, 2007, the symptoms could reasonably be expected to be produced by her condition and that the condition was disabling.

**The Medical Evidence**

In his examination of May 6, 2006, Dr. Maaz reports that plaintiff reports seizures since she was 17. Her last seizure was during her sleep and she was told that she was shaking and bit her tongue. Her last seizure was one week before seeing Dr. Maaz. (Tr. 162) She said she had been treated by Dr. Disouza (sic) in the past but never took her medication of Lanictal.[6] She has *deja vu* symptoms before the seizure. Dr. Maaz scheduled her for an EEG, MRI, and to start taking Spironolactone at the starting dose. (Tr. 163) She returned January 5, 2007 and stated that since Christmas she had several seizures. In the small seizure, she gets stiff, flutters her eyes, drools, and is not responsive. This lasts about ten to 12 minutes followed by postictal confusion for about two minutes. Her major seizures consist of loss of consciousness, falling down, eyes rolled back in the head, convulsion, tongue biting, no urinary incontinence, and Postictal confusion for about 15 minutes. (Tr. 165) On exam, muscle bulk and tone were normal; strength was 5/5. Deep tendon reflexes are 1+. Finger to nose test and heel to shin were normal. Gait and tandem walk were normal; Romberg test was negative. (Tr. 165) The recommendation was: Continue taking Lanictal 100 mg 3x/day; have a blood work-up; do not drive or operate a machine for six months after the last seizure and do not work near an open fire or at a height without protection. She was to return to the office in two weeks. Id.

A reviewer noted the following:

- 6-06: Has never been on any seizure medication. Prescribed spironolactone
- 1-07: PE within normal limits; has had seizures since 12-06.
- 4-26-07: Office Visit: no major seizures

---

[6]No notes or opinions from Dr. Disouza are in the record.

- 6-29-07: No Grand Mal Seizure in over 12 months.

(Tr. 170)

Plaintiff wrote a letter to the Agency describing her seizures on unspecified dates while driving on two occasions. She stated that on one she pulled off the road and just fell asleep. On the other, she went into someone's home that she had never met, and when they called the police, she said she was having a seizure. Neither event was formally recorded by the police. (Tr. 62, 195) It does not appear that plaintiff was re-examined based on her condition until after benefits were awarded. (Doc #16, page 16; Notice of Driver Assessment Reexamination)

In July, 2007, plaintiff was examined by Dr. Anne Pawlak, D.O. who opined that plaintiff presented with a history compatible with seizure activity. She still had not had an MRI or a current EEG and CT scan in the past was unremarkable. Plaintiff had been prescribed Lanictal but it was not clear if she was taking it. Dr. Pawlak suggested that she try raising the dose to 700 mg. Plaintiff was advised that "if she should start Lanictal, she is to let me now since on this particular agent blood level is driving downward with the initiation of a contraceptive." Dr. Pawlak also discussed the effect of a pregnancy on the appropriate dosage, the need for folic acid, and other associated medication adjustments. (Tr. 179)

In January, 2008, plaintiff was working as a volunteer and student at North Cottage in Dearborn Michigan. According to the police report, shortly after noon, plaintiff felt a seizure coming on and fell down before she could sit down. She received a cut to her chin, left finger, and left palm when she fell to the pavement. These were bandages by a coworker or police and she declined further medical treatment. She appeared to recover shortly after. (Tr. 187)

She was first seen August 25, 2008 at the University of Michigan by Dr. Glynn on a referral from Dr. Desousa. (Tr. 190-193). The chief complaint was noted as refractory epilepsy [epilepsy which does not respond to medications]. She was seen with her grandmother. The physician reviewed outside medical records and reports of medical images. By history, plaintiff reported that since 2004 she has not been seizure free for more than several months. The seizures seemed tied to her menstrual cycle. According to plaintiff, the seizures have not responded to medication. Her medication history was given as follows: She began taking Lanictal in 2004 to a maximum dose of 400 mgs twice a day. Topamax was added in 2005 but that was not helpful. Keppra was started in 2007 with a maximum dose of 1000 mg.[7] Plaintiff also reports taking an oral contraceptive pill. Plaintiff states that she was not married, was completing her undergraduate degree in education, and lives with her grandparents. She does not drink but smokes one pack of cigarettes a day. (Tr. 191) Plaintiff described frequent migraine headaches and her memory as terrible. On examination, she was alert, pleasant, in no distress. Mental status was intact.

Plaintiff had several EEGs which were reviewed by Dr. Glynn. They were interpreted as demonstrating bi-temporal epileptogenic foci. (Tr. 192) The EEG in December, 2005 was normal. The June 13, 2008 EEG showed right hemispheric burst of sharp waves and some right temporal bursts following hyperventilation for two minutes. On April 18, 2008, there was rhythmic high-voltage activity affecting the left temporal region; sharp waves in the right temporal region. In August, 2008, hyperventilation demonstrated diffuse burst, but no spike.

---

[7]This medication history is different from that offered by her to other doctors.

Sharp waves were seen in the temporal regions, slightly more on the right than the left. (Tr. 192) Plaintiff's MRI of June 23, 2008 showed some abnormalities. Id. There were various suggestions for the onset of the epilepsy and a plan was developed for follow up. She was to have an MRI seizure protocol at the University of Michigan to better characterize the lesion described; the EEG was to be performed at the University of Michigan in a sleep-deprived setting to validate and clarify the outside interpretations; she was referred for a consult for a different birth control pill which may afford better control of the seizures; she was to get several baseline blood studies and medication levels. Keppra level would be increased to 1500 mg twice a day and to consider different medications. (Tr. 193)

On September 2, 2008, about a week after seeing her, Dr. Glynn wrote a letter indicating that plaintiff was on two medications for her epilepsy but her clinical seizures are not well controlled. He reported that she had five clinical seizures a month. He stated: "This medical condition clearly restricts her opportunities for employment, and unfortunately imposes large costs for prescriptions and testing. . . is unable to drive unless her seizures stop completely with medicine." (Tr. 196) No further medical evidence is in the file.

**Plaintiff's Arguments**

*1. Plaintiff is not entitled to an earlier onset date.*

The ALJ determined that plaintiff was disabled as of January 5, 2007. He notes that before that date she was not on medication. Plaintiff, in her letter, admits that she would have been on medication "if she had her choice." She was not covered for insurance. However, she then goes on to imply that she may have received medication through the drug company directly;

but "either way I was still on the medication which makes the defense of Social Security untrue." From these statements it is impossible to tell whether she was or was not on medication. She has stated to some doctors that she did not take medication, even if it was prescribed, but when she was seen at University of Michigan in 2008, there is inexplicably a complete list of medications going back to 2004.

She states in her letter that she was diagnosed in December, 2005, but wants an onset date of January 2005, apparently as a result of the seizure while driving. She points to no diagnosis of that date. The referral date to Dr. Maaz from Dr. Pierce occurred in May or June, 2006. At that time, plaintiff reported several seizures since Christmas. She was to "continue taking Lanictal 100 mg three times a day." Whether she took it is completely unclear. It was not error for the ALJ to find that prior to January 5, 2007, she was not on medication.

In addition, during this time period she was attending school full time, working as a waitress, and student teaching. She liked to craft, read, and visit with friends. Her seizures and headaches are not shown to be disabling.

As a general proposition in social security cases, a determination of disability based on pain depends largely on the credibility of the plaintiff. *Houston,* 736 F.2d at 367; *Walters v. Commissioner of Social Security,* 127 F.3d 525, 531 (6th Cir. 1997); *Villarreal v. Secretary of HHS*, 818 F.2d 461, 463 (6th Cir. 1987). Because determinations of credibility are peculiarly within the province of the ALJ, those conclusions should not be discarded lightly. *Villarreal*, 818 F.2d at 463 and 464. As explained in *Saddler v. Commissioner of Social Sec.* 1999 WL 137621, 2 -3 (6th Cir,1999), a strong indication of the credibility of an individual's statements is their

consistency, both internally and with other information in the case record. Here, plaintiff's statements to doctors, to social security, and to others change over time and are not consistent. There is substantial evidence to support the denial of disability before January 5, 2007.

It also should be noted that Social Security Ruling 83-20 governs the determination of disability onset date. This circuit discussed application of that ruling in several cases including *McClanahan v. Commissioner of Social Sec.* 193 Fed.Appx. 422, 425, 2006 WL 2431000, 2. (6th Cir. 2006) There, the court stated that once a finding of disability is made, the ALJ must determine the onset date of the disability. *See Key v. Callahan,* 109 F.3d 270, 274 (6th Cir.1997). The ruling states, in relevant part:

> Factors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence. These factors are often evaluated together to arrive at the onset date. However, the individual's allegation or the date of work stoppage is significant in determining onset only if it is consistent with the severity of the condition(s) shown by the medical evidence. . . . Particularly in the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity (i.e. be decided on medical grounds alone) before onset can be established.... In some cases, it may be possible, based on the medical evidence, to reasonably infer that the onset of a disabling impairment occurred sometime prior to the date of the first recorded medical examination, e.g. the date the claimant stopped working.

SSR 83-20; *McClanahan v. Commissioner of Social Sec.* 193 Fed.Appx. 422, 425, 2006 WL 2431000, 2 (6th Cir. 2006) It is not necessary for the ALJ to mention SR 83-20 during the disability determination. The *McClanahan* court stated that although Social Security Rulings are binding on all components of the Social Security Administration and represent "precedent final opinions and orders and statements of policy and interpretations" neither *Blankenship v. Bowen,*

874 F.2d 1116, 1122 n. 9 (6th Cir.1989) nor the Rulings stand for the proposition that an ALJ must refer with specificity to Social Security Rulings when making disability determinations.

2. *The ALJ Appropriately Considered the Medical Opinions Prior to January, 2007*

No medical records are in the file from the period before May or June, 2006. There was no opinion evidence from any treating or examining physician placing any functional limitations on plaintiff prior to January 5, 2007. (Tr. 165) There are no medical opinions that plaintiff is disabled at any time. The closest is from Dr. Glynn and that does not come until 2008 when he opines after seeing her only a week earlier that her "condition clearly restricts her opportunities for employment."

**Conclusion**

Accordingly, it is recommended that the defendant's motion for summary judgment be granted, that of the plaintiff (by way of letter) denied, and the decision denying disability benefits prior to January 5, 2007 be affirmed.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report

and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court.  The response shall address each issue contained within the objections specifically and in the same order raised.

         s/Virginia M. Morgan
         Virginia M. Morgan
         United States Magistrate Judge

Dated: June 30, 2010

**PROOF OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System and/or U. S. Mail on June 30, 2010.

         s/Jane Johnson
         Case Manager to
         Magistrate Judge Virginia M. Morgan